Bill LOVING, Plaintiff,

v.

David BOREN, President of the
University of Oklahoma,
Defendant.

No. CIV–96–657–A.

United States District Court,
W.D. Oklahoma.

Jan. 28, 1997.

954

Bill Loving, Norman, OK, pro se.

Kurt F. Ockershauser, Fred A. Gipson, Joseph Harroz, Jr., Lisa Millington, Jill Bush Raines, University of Oklahoma, Norman, OK, Susan Gail Seamans, University of OK Health Science Center, Legal Counsel Office, Oklahoma City, OK, for David Boren.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEY, District Judge.

This matter comes before the Court on Plaintiff's complaint for injunctive and declaratory relief. Plaintiff is a professor at the University of Oklahoma. Defendant is the President of the University of Oklahoma (OU). Plaintiff alleges that Defendant has violated his rights of free speech guaranteed by the First Amendment. Trial was held on January 17, 1997. On that date, the Court took the matter under advisement and now makes the following findings and conclusions.

Sometime prior to March 29, 1996, President Boren was visited by Representative Peary of the Oklahoma House of Representatives. Representative Peary brought to President Boren's attention that material which he considered clearly obscene was available in news groups that were carried on OU's news server. He raised concerns that OU might be violating state law by distributing obscene material. Oklahoma law makes it a felony to "distribute ... any obscene or indecent writing, paper, book, picture, photograph, motion picture, figure, form or any description or any type of obscene material." 21 O.S. 1021. It was suggested that OU was acting as a distributor by allowing obscene material to be downloaded via the news server owned and operated by OU.

On March 29, 1996, President Boren, through his staff, blocked a number of news groups from being accessed through the OU news server. News groups are interactive "places" on the Internet into which anyone with access, anywhere in the world, may place graphic or text messages. These messages may then be read, looked at or added to by anyone else with access. Prior to March 29, 1996, users of the OU news server had unlimited access to all news groups available on the Internet. After March 29, 1996, users of the OU news server no longer had any access to the blocked groups through that server, although computer-savvy users could get to the same new groups through other, perhaps less convenient, routings.

President Boren resolved to block certain groups because he believed that they arguably contained obscene material the dissemination of which would violate state law. The violation could result in institutional and personal criminal penalties, and perhaps forfeiture of the OU computers. It is unclear from testimony at trial how the blocked groups were chosen. It is clear that there was no systematic examination of the groups before they were blocked, and that some groups that did not contain obscene material were blocked.

On the same day that the groups were blocked, the University undertook to devise a new policy that would attempt to walk the narrow line that OU officials perceived, a line between possible violations of state law and obligations to observe the First Amendment. In the nature of academic communities, this change in policy required the assembly of a task force and the participation of several committees, the faculty senate, and the Board of Regents. The process was necessarily slow. Sometime in the first week of January, 1997, shortly before trial, OU put its new policy in place.

### PLAINTIFF'S CLAIM

Plaintiff seeks a declaration that his constitutional rights were violated and an injunction that would require OU to return to its former policy of allowing access to all news groups via an unrestricted news server. In order to merit an injunction, a plaintiff must demonstrate that he will be irreparably harmed if the injunction is not granted. *See Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280 (10th Cir.1996).

■ The Plaintiff, representing himself, rested his case without demonstrating an essential element. Plaintiff called as witnesses President Boren and the Director of Computing Services at OU, but he did not testify himself. He did not present any evidence at trial that he was harmed by the actions of Plaintiff or that he will suffer any harm if no injunction is granted. There was no specific, substantial evidence at trial that Plaintiff was affected by the blocking. Indeed, there was no evidence that any person ever attempted to reach the news groups that were blocked during the period that they were blocked. Material that was discussed by Plaintiff in his argument is not evidence. Only testimony under oath or exhibits entered into evidence may be considered as evidence by the Court. Plaintiff has failed to establish facts that would merit an injunction.

Similarly, Plaintiff has not made out a claim for declaratory relief. He has not shown that Defendant's actions affected him personally. "In the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy." *Cardinal Chemical Company v. Morton International, Inc.*, 508 U.S. 83, 95, 113 S.Ct. 1967, 1974, 124 L.Ed.2d 1 (1993). Plaintiff has failed to meet that burden. Without reaching any conclusions about the actions of the defendant, the Court determines that Plaintiff has not shown that his constitutional rights were violated.

### THE NEW POLICY

The new policy for access to news servers at OU meets constitutional standards. Under the new policy, put in place by OU in January of 1997, OU maintains two news servers. The "A" server allows access to only those news groups approved by OU, or rather, those groups that have not been disapproved. The "B" server allows access to all news servers, including those previously blocked. Use of the "B" server is restricted; to access the "B" server, a user must be over eighteen years of age, and must "click" on a box that denotes acceptance of specific terms governing the use of the "B" server. Ac-

cording to the terms of use, the "B" server may only be used for academic and research purposes.

■ The result of this policy is to allow recreational use of Internet services on the "A" server, but to restrict the use of certain news groups to academic and research purposes. A university is by its nature dedicated to research and academic purposes. The limitation of OU Internet services to research and academic purposes on the "B" server is not a violation of the First Amendment, in that those purposes are the very ones for which the system was purchased.

■ The OU computer and Internet services do not constitute a public forum. There was no evidence at trial that the facilities have ever been open to the general public or used for public communication. "[T]he state, no less than a private owner of property, has the right to preserve the property under its control for the use to which it is lawfully dedicated." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 814, 104 S.Ct. 2118, 2134, 80 L.Ed.2d 772 (1984) (quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)). In this case, the OU computer and Internet services are lawfully dedicated to academic and research uses. Within these uses, access by an adult is plenary.

Whatever the constitutional state of affairs may have been before the new policy was enacted, the current situation meets constitutional requirements. Thus, by enacting the new policy, OU has effectively mooted Plaintiff's claim.

### ALTERNATIVE ROUTES

■ OU makes a second argument for mootness. Evidence at trial showed that during the period when certain news groups were blocked on the OU news server, those news groups could still be reached using OU computers, via the Internet or the World Wide Web. The Court is puzzled by this argument. According to the testimony of President Boren, news groups were blocked from the OU news server because of concerns that OU arguably could be regarded as "distributing" obscene material found in

some of those news groups, through that news server, in violation of state law. Yet OU argues that the same obscene material could have been reached at any time in other ways, using OU computers.

Neither argument at trial nor the briefs give an indication of whether OU is liable to state prosecution when users reach obscene material through the alternative route on the Internet or Web using OU computers. However, the Court agrees that the fact of alternative routes to reach the blocked news groups does make Plaintiff's claim moot.

## CAPABLE OF REPETITION, YET EVADING REVIEW

■ Courts will consider issues that are moot, but "capable of repetition, yet evading review" *Norman v. Reed,* 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494–95, 23 L.Ed.2d 1 (1969). Plaintiff argues that his case is capable of repetition, He argues that OU could block all Internet access and thus block the alternative routes to news groups. There is no indication that this will occur. The new policy put in place by OU does not provide for further blocking of access. Federal courts may not "give opinions upon moot questions or abstract propositions." *Calderon v. Moore,* —— U.S. ——, ——, 116 S.Ct. 2066, 2067, 135 L.Ed.2d 453 (1996); *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). Until OU takes action to block Plaintiff's Internet access, there is no case or controversy for the Court to consider.

Plaintiff also argues that, theoretically, every server in the world could choose to block a particular news group and then.that group could not be reached via the Internet or the Web. This is theoretically true, but so impossibly remote that the Court will not consider the argument.

## CONCLUSION

The Court finds that Plaintiff's constitutional rights were not violated and that he is not entitled to injunctive relief. Judgment is entered for the Defendant.